UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANESBRANDS INC. and <br> HBI BRANDED APPAREL <br> ENTERPRISES, LLC, <br> <br> Plaintiffs, <br> <br> v. <br> <br> KEDS, LLC and SR HOLDINGS, LLC, <br> <br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * Civil No. 1:20-cv-11354-IT <br> * <br> * <br> * <br> * |

MEMORANDUM AND ORDER

May 21, 2021

TALWANI, D.J.

Plaintiffs Hanesbrands Inc. and HBI Branded Apparel Enterprises, LLC (singularly or collectively, "Hanes") brought this action against Defendants Keds, LLC, and SR Holdings, LLC (collectively, "Keds"). Hanes asserts six federal and state law claims against Keds: trademark infringement (Count I); unfair competition and false association (Count II); trademark dilution (Count III); actual and anticipatory breach of contract (Count IV); breach of the implied covenant of good faith and fair dealing (Count V); and unfair and deceptive trade practices (Count VI). Compl. ¶¶ 59-97 [#1]. Pending before the court is Keds' Motion to Dismiss [#24]. For the following reasons, the motion is GRANTED.

I.      **Factual Background**

As alleged in the Complaint [#1] and the incorporated documents, the facts are as follows.

Beginning in the 1930s, Hanes' predecessor-in-interest, Champion Products, Inc. ("Champion"), used the CHAMPION trademark to market, promote, and sell Champion-branded

apparel. Compl. ¶¶ 1-8 [#1]. Meanwhile, Keds owned the CHAMPION mark ("KEDS CHAMPION") for casual footwear in the United States and Canada. Id. at ¶ 9; License Agreement 2 [#16-3]. In 1987, Keds and Champion executed a License Agreement, wherein Keds granted Champion the right to use the KEDS CHAMPION mark in the United States and Canada for "high performance athletic shoes." Compl. ¶¶ 9, 29-30 [#1]; License Agreement 2 [#16-3]. Since then, the License Agreement has automatically renewed at the end of each five-year renewal term, with the most recent term having begun on January 1, 2017. Compl. ¶ 29 [#1].

The License Agreement prohibits Champion, and now Hanes, from producing footwear in the category of "casual, street and play time wear, and footwear designed for walking and for general purposes."[1] License Agreement 2 [#26-3]. However, it permits Hanes to use the mark on athletic shoes "in the United States, Canada, Puerto Rico and in any other country where Keds may have acquired rights" in the KEDS CHAMPION mark for shoes.[2] Id. at 6. It also "does not preclude" Hanes from using the mark for athletic shoes "in any country where Keds does not have rights in the mark and where [Hanes] may have acquired or will acquire superior rights in said trademark for [athletic shoes]." Id.

---

[1] Hanes' Complaint [#1] flips this language on its head, alleging that the License Agreement *permits* Keds the right to use the CHAMPION mark for the "narrow category of casual street and playtime shoes." Compl. ¶ 30 [#1]. However, the License Agreement, which is incorporated by reference in the Complaint [#1], makes clear that Keds owns the mark for footwear and that Hanes has licensed the mark for use in connection with athletic footwear. License Agreement [#26-3].

[2] Over time, Keds has acquired registrations for use of the mark in Belgium, the Netherlands, Luxembourg, Brazil, France, Germany, Italy, Japan, Mexico, Spain, and the United Kingdom. Compl. ¶ 12 and n.1 [#1].

Since 1987, there have been twelve amendments to the License Agreement. Compl. ¶¶ 36, 55 [#1]. Each amendment concerns sublicensing and grants Champion and then Hanes the right to sublicense the KEDS CHAMPION mark to various third parties. Amendments [#26-4]. In late 2017, Hanes and Keds began negotiations regarding the "Tenth Amendment," which would allow Hanes to grant a new sublicense. Tenth Am. [#26-5]. Specifically, the Tenth Amendment, as executed in January 2018, opens with the following statement:

> WHEREAS, effective as of November 1, 2017 ("Tenth Amendment Effective Date"), Keds consent to [Hanes'] sublicensing its rights to use the Keds' Champion Marks to BBC International LLC ("BBC") upon all of the terms and conditions as contained in the License Agreement, as amended hereby.

Id. at 2. Then, "in consideration of the promises contained herein," the parties agreed to several conditions regarding the scope of Hanes' sublicensing rights, including the requirement that Hanes obtain Keds' approval of a sample of each sublicensed product prior to distribution; Keds' royalty payments; and Keds' right to audit BBC as related to the sublicensed products. Id. at ¶¶ 1-5. In addition, the Tenth Amendment contained the following promise:

> Keds asserts that through many years of use without objection, it has acquired equitable rights to continue its historic uses of the CHAMPION word mark outside of the [United States and Canada ("the Territory")]. [Hanes] disagrees with such assertion, and does not agree that Keds has any rights in the CHAMPION word mark outside of the Territory beyond any rights Keds may have in those jurisdictions where Keds has registered trademark rights to "KEDS CHAMPION". In consideration of the execution of this Tenth Amendment by Keds, [Hanes] hereby waives and releases Keds from all causes of action it may have stemming from or arising out of Keds's historic uses of the CHAMPION trademark outside of the Territory (and Keds's continued uses during the time period described below), such uses consisting primarily of use on shoeboxes, shoe tongue labels, and other venues (e.g., websites) as a product or collection name, and [Hanes] agrees that [Hanes] will not contest the continuance of such historic uses for sixty (60) months after the Tenth Amendment Effective Date, or until renegotiation of the License Agreement, whichever occurs first. Such agreement by [Hanes] to not contest the continuance of Keds's historic uses does not extend to any uses by Keds of the CHAMPION word mark which are in addition to such historic uses. Except as set forth above, this Section 7 is without prejudice to [Hanes's] and Keds's rights and remedies, all of which are expressly reserved.

Id. at ¶ 7.

This paragraph creates a "temporary and conditional agreement" by Hanes to refrain from contesting Keds' allegedly improper international use of the CHAMPION mark. Compl. ¶ 42 [#1]. This agreed-upon moratorium on contesting Keds' "historic uses of the CHAMPION trademark" in countries other than the United States and Canada is in effect for five years "after the Tenth Amendment Effective Date or renegotiation of the License Agreement, whichever comes first." Id. at ¶ 41.

Hanes alleges, however, that since the Tenth Amendment went into effect, Keds has "deliberately expanded its use of the CHAMPION trademark in connection with the marketing and sale of its shoes in foreign territories, including through more prominent use of the CHAMPION mark itself." Id. at ¶ 44. For example, Keds has allegedly marketed its Champion line of shoes in Taiwan, Austria, and Korea since 2018, despite having no or inferior registered trademarks to CHAMPION or KEDS CHAMPION in those jurisdictions. Id. at ¶¶ 44–47.

Hanes claims that it has repeatedly attempted to engage Keds in a substantive discussion about the parties' relationship and the License Agreement in general. Id. at ¶¶ 52-55, 57. In April 2018, Hanes unsuccessfully attempted to engage Keds in a discussion "regarding an outright purchase of Keds' limited rights to the CHAMPION trademark." Id. at ¶ 53. A year later, in May 2019, Hanes' reiterated its offer to purchase Keds' rights but "Keds explained . . . that its interest in the CHAMPION trademark was not solely driven by a would-be purchase price, but was inextricably tied to the ongoing royalties Keds stood to gain from the perpetual License Agreement with Hanes." Id. at ¶¶ 53-54. Hanes contacted Keds the day after the May 2019 meeting to request that the parties modify the License Agreement to "afford Hanes more financial and operational flexibility in growing its domestic footwear business while preserving a

revenue stream for Keds and permitting the expansion of Keds' trademark rights in foreign territories." Id. at ¶ 54. In September 2019, Keds expressed its lack of interest in further discussions. Id.

In March 2020, while discussing a Twelfth Amendment, Hanes proposed to add language to schedule renegotiations of the License Agreement to occur between March and December 2020 and to stipulate that if negotiations were unsuccessful, "then Hanes' temporary agreement not to contest Keds' international use of the CHAMPION trademark would be of no further force and effect." Id. at ¶ 55. Keds objected to the proposed addition and demanded its removal from the Twelfth Amendment. Id. Keds is allegedly unwilling to renegotiate the terms of the License Agreement unless Hanes is willing to agree that "such negotiations would not terminate that moratorium." Id. at ¶ 50. Hanes has not agreed to that condition. Id.

## II.     Standard of Review

In evaluating a motion to dismiss, this court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). In ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters

susceptible to judicial notice.'" Lydon v. Local 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014) (quoting Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original).

### III. Discussion

Hanes brings two sets of claims: (1) contract claims, including a derivative unfair and deceptive trade practices claim under Mass. Gen. Laws ch. 93A § 11 ("chapter 93A"), and (2) trademark claims under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* The court considers each in turn.

#### A.   *Contract Claims*

##### 1.   Actual and Anticipatory Breach of Contract (Count IV)

To state a claim for breach of contract, a plaintiff must allege facts demonstrating that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007). The plaintiff must allege more than that "the facts [demonstrate a] breach of that contractual relationship." Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). Rather, the plaintiff must describe "with 'substantial certainty,' the specific contractual promise the defendant failed to keep." Brooks, 480 F.3d at 586 (citing Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007)).

Hanes asserts breach of two promises. First, Hanes alleges that Keds breached its contractual obligation under the Tenth Amendment "by refusing and failing to engage in renegotiation . . . regarding the License Agreement." Compl. ¶ 86 [#1]. Second, Hanes claims that Keds anticipatorily breached the Tenth Amendment by conditioning renegotiation of the

License Agreement on Hanes' agreement not to terminate its "temporary and conditional" moratorium on contesting Keds' "historic uses of the CHAMPION trademark." Id. at ¶¶ 41, 86.

Hanes first attempts to frame this contract dispute as "a substantive question of contract interpretation premature at the pleading stage." Pl's Opp. 14 [#35] (citing BASF Corp.v. Martineaus Auto Body, Inc., 2019 WL 383885, at *3 (D. Mass. Jan. 30, 2019)). In the case on which Hanes relies, the defendants submitted extrinsic evidence to controvert the allegations made in the complaint. See BASF Corp., 2019 WL 383885, at *3. That is not the case here. Instead, Hanes and Keds simply differ on the meaning of the contract language that is properly before the court.

Hanes next argues that the contractual language is ambiguous and that the motion to dismiss must therefore be denied. Pl's Opp. 22-23 [#35] (citing Aware, Inc. v. Centillium Commc'n., Inc., 604 F. Supp. 2d 306, 310 (D. Mass. 2009) and NExTT Sols., LLC v. XOS Techs., Inc., 113 F. Supp. 3d 450, 457 (D. Mass. 2015)). Under Massachusetts law, contract interpretation is ordinarily a question of law. See Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516, 258 N.E.2d 786 (1970). It is also for the court to decide whether a contractual provision is ambiguous. Id. In making that determination, the court looks to the plain language of the contract. Id. "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165 (1995). Rather, "[a] term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 426 Mass. 379, 381, 688 N.E.2d 951 (1998) (quoting Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475, 503 N.E.2d 474 (1987)). Where ambiguity exists, construction of the terms becomes a question

of fact for a jury. See Trafton v. Custeau, 338 Mass. 305, 307–08, 155 N.E.2d 159 (1959). Where the contract is unambiguous, though, it must be enforced according to its terms. Freelander, 357 Mass. at 516.

Applying these principles to the Tenth Amendment, the court concludes that the provisions at issue are unambiguous. Hanes' claim hinges on the premise that, under the Tenth Amendment, Keds is required to engage in a renegotiation of the License Agreement. See Compl. ¶ 51 [#1] ("Keds has wrongfully deprived Hanes of the full benefits it secured in Section 7 of the Tenth Amendment, i.e., the negotiations promised in that Section"). But the Tenth Amendment imposes no such obligation on Keds. In relevant part, the Tenth Amendment states:

> In consideration of the execution of this Tenth Amendment by Keds, [Hanes] hereby waives and releases Keds from all causes of action it may have stemming from or arising out of Keds's historic uses of the CHAMPION trademark outside of the Territory (and Keds's continued uses during the time period described below), such uses consisting primarily of use on shoeboxes, shoe tongue labels, and other venues (e.g., websites) as a product or collection name, and [Hanes] agrees that [Hanes] will not contest the continuance of such historic uses for sixty (60) months after the Tenth Amendment Effective Date, or until renegotiation of the License Agreement, whichever occurs first.

Id. at ¶ 41. Renegotiation of the License Agreement is mentioned as one of two possible ways to calculate the duration of Hanes' moratorium on contesting Keds' use of the mark. Nothing in the contractual language implies an obligation on either party to engage in renegotiation. To the contrary, the fact that the contract contemplates an alternative end date to the moratorium suggests that the parties were aware that renegotiation might not occur within sixty months. Had Hanes considered that possibility unacceptable, it could have changed the language to explicitly commit the parties to renegotiate within five years. As worded, though, the contract cannot be interpreted to impose such an obligation.

Hanes also argues that because the contract uses the language "until renegotiation," it must be read to impose an obligation on Keds, lest it become an illusory promise with no

consideration. Pl's Opp. 16 and n.11 [#35]. But the contract explicitly states that Hanes' consideration is "the execution of this Tenth Amendment by Keds," which contains other provisions that constitute consideration, importantly Keds' consent to Hanes sublicensing the KEDS CHAMPION mark to a third party, which was the very purpose of the agreement. Tenth Am. [#26-5]. The court therefore concludes that the contract does not require Keds to renegotiate the License Agreement and that Hanes has failed to state a claim for breach of contract.

      2.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count V)

Hanes' second contract claim is based on Keds' alleged breach of the implied covenant of good faith and fair dealing. Under Massachusetts law, "the covenant of good faith and fair dealing is implied in every contract," UNO Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract," Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991). While the implied covenant may not "be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship," UNO Rests., 441 Mass. at 385–86, the essential inquiry is "whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance," Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 612 (D. Mass. 2016).

Hanes alleges that Keds breached the implied covenant by refusing to renegotiate the License Agreement for the purpose of "depriving Hanes of the rights and benefits of the Tenth Amendment and [] unfairly leverage[ing] the terms of that Amendment to secure an undue economic advantage for themselves." Compl. ¶ 90 [#1]. As previously explained, though, the

9

Tenth Amendment does not impose an affirmative obligation on Keds to renegotiate the License Agreement. Nor has Hanes presented facts suggesting bad faith: while Keds may have refused to renegotiate for the purpose of preserving the moratorium, Hanes has not alleged any fraud, deceit, or misrepresentation on Keds' part that would reasonably have led Hanes to believe that Keds agreed to renegotiate the License Agreement. Additionally, there is no evidence that Keds interfered with Hanes' ability to benefit from the provisions of the Tenth Amendment, such as the sublicensing agreement. While Hanes may be disappointed that Keds is unwilling to renegotiate the License Agreement, Keds is not required to do so, and Hanes cannot ask the court to rewrite a contract through the implied covenant of good faith and fair dealing.

        3.        *Unfair and Deceptive Trade Practices (Count VI)*

Hanes also brings a claim for unfair and deceptive trade practices under chapter 93A. Compl. ¶¶ 92-97 [#1]. The claim, which is based on allegations that Keds breached the contractual terms of the Tenth Amendment and the implied covenant of good faith and fair dealing, is derivative of its contract claims. See id.; Pl's Opp. 20 [#35]. Where the court dismisses those claims, the chapter 93A claim must also fail. Cf. Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 40, 815 N.E.2d 241 (2004) (no basis for recovery where plaintiff's chapter 93A claim was "wholly derivative" of unsuccessful tort claim).

        B.        *Trademark Claims*

In addition to its contract claims, Hanes bring three claims under the Lanham Act for trademark infringement, unfair competition and false association, and trademark dilution. Specifically, Hanes alleges that it has "clear priority in most international jurisdictions" based on its "substantial investment and widespread marketing, promotion, and distribution of its

CHAMPION-branded shoes and apparel" and that Keds' unauthorized use of the CHAMPION mark harms Hanes by (1) causing confusion "as to the origin of CHAMPION-branded footwear," (2) damaging Hanes' goodwill, (3) misleading and deceiving consumers into believing that Keds' shoes are associated with Hanes, and (4) eroding and impairing the distinctiveness of the CHAMPION trademark and the public's exclusive association of that mark with Hanes. Compl. ¶¶ 12-13, 70, 74, 80 [#1]. Keds counters that Hanes is contractually barred from asserting trademark claims against Keds based on the contractual language of the Tenth Amendment. Defs' Mem. 13 [#25]. In the alternative, Keds argues that this court lacks jurisdiction over Hanes' extraterritorial Lanham Act claims and that Hanes' claims do not meet the plausibility pleading standard.

      1.     Scope of the Claims

As an initial matter, the court determines that Hanes' trademark claims are limited but not altogether barred by the court's conclusions regarding the contract claims. Under the Tenth Amendment, Hanes "waives and releases Keds from all causes of action it may have stemming from or arising out of Keds's historic uses of the CHAMPION trademark" outside of the United States and Canada. Compl. ¶ 41 [#1]. This moratorium is currently in effect and remains so until November 1, 2022, unless the parties renegotiate the License Agreement before that date. Id. at ¶¶ 40-41. Keds argues that Hanes is accordingly barred from asserting its Lanham Act claims at this time. Defs' Mem. 13-14 [#25]. The moratorium applies only to Keds' *historic* uses of the mark, though. Where Hanes' claims challenge such historic uses, they are barred. But to the

11

extent that the claims are based on Keds' allegedly *expanded* uses of the CHAMPION mark, see Compl. ¶¶ 42-47 [#1], they do not fall within the ambit of the moratorium.[3]

  2.  Subject Matter Jurisdiction

Enacted in 1946, the Lanham Act establishes a national system of trademark registration. 15 U.S.C. §§ 1051 *et seq*. The Act has two general purposes. The first is to prevent consumer confusion regarding the source of goods and services. In other words, it strives to "quickly and easily assure[] a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 163-64 (1995) (emphasis in original). The second is to incentivize businesses to invest in their brands by assuring them "that [they] (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." Id. at 164. The Act "simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." Id. Writ large, the Act reflects the notion that "[n]ational protection of trademarks is desirable . . . because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198 (1985).

"The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." Person's Co. v. Christman, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990). This means that trademark rights are secured on a country-by-country basis: if a United States company wishes to market goods under a particular mark in,

---

[3] The Complaint [#1] does not make entirely clear, however, what Keds' expanded uses of the mark entail.

say, the United States, Canada, and Mexico, it needs to acquire trademark rights under the laws of each nation. See Ingenohl v. Walter E. Olsen & Co., 273 U.S. 541, 544 (1927) ("A trade-mark started elsewhere would depend for its protection in Hongkong upon the law prevailing in Hongkong and would confer no rights except by the consent of that law"). As a corollary, Canada's and Mexico's trademark laws would not generally apply to marks acquired in the United States, and vice versa.

As commerce has become progressively global, though, exceptions to the territoriality principle have been made. One exception was developed in Steele v. Bulova Watch Co., 344 U.S. 280 (1952). In that case, the Bulova Watch Company—then one of the largest watch manufacturers in the world—sued Sidney Steele, an American living in Texas, for using the name "Bulova" on watches that he assembled and sold in Mexico. Id. at 281, 285. The Supreme Court held that the Lanham Act could be extraterritorially enforced against Steele for several reasons. First, the Court reasoned that the Lanham Act reaches "all commerce which may lawfully be regulated by Congress" and that where the foreign activities form part of a domestically unlawful scheme, Steele could not "evade the thrust of the laws of the United States" by effectuating some part of it abroad. Id. at 287. Second, Steele's conduct had "effects" on commerce within the United States; specifically, "spurious 'Bulovas' filtered through the Mexican border into this country [and] his competing goods could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad." Id. at 286. Essentially, the same purposes that animate the Lanham Act justify its extraterritorial enforcement under certain circumstances. And importantly, although Steele had registered the Bulova trademark in Mexico, by the time the case made its way to the Supreme Court, the Mexican trademark had been cancelled. Id. at 285. Extraterritorial enforcement of the

Lanham Act against Steele did not therefore carry the complication of a potential conflict with Mexican law.

From Steele, the Second Circuit distilled a widely adopted three-factor test for assessing when a court may apply the Lanham Act to activities in foreign jurisdictions. See Vanity Fair Mills, Inc. v. T Eaton Co., 234 F 2d 633, 643 (2d Cir. 1956). First, the defendant's conduct must have a "substantial effect" on commerce in the United States. Id. Second, the defendant must be a United States citizen. Id. This requirement invokes the supervisory role of domestic courts over United States citizens abroad, which, while not made explicit in Steele, seemed to undergird its conclusion that the defendant should not be permitted to "evade" domestic law. See Steele, 344 U.S. at 287; see also Skiriotes v. State of Fla., 313 U.S. 69, 73 (1941) ("the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries"). Finally, there must be no conflict with trademark rights under foreign law. Vanity Fair, 234 F 2d at 643. Under the test, "the absence of one of the above factors might well be determinative" and the absence of two factors "is certainly fatal." Id.

The analysis is somewhat different in this circuit. In McBee v. Delica Co., the First Circuit considered the case of Cecil McBee, an American jazz musician, who brought Lanham Act claims against a Japanese company that marketed "adolescent female clothing" under the mark "Cecil McBee." 417 F.3d 107, 111 (1st Cir. 2005). McBee testified that he found this use of his name "undignified, highly offensive and repugnant" and that it tarnished his reputation. Id. at 114. Unlike in Steele, though, the Japanese courts had upheld the validity of the defendant's trademark on the grounds that McBee's name "had not received sufficient recognition in general Japanese society." Id. at 113 and n.1.

In resolving the dispute, the First Circuit disaggregated the Vanity Fair factors into a two-step inquiry. Under its formulation, a court first asks whether the defendant is a United States or a foreign citizen. Id. at 111. Where, as in McBee, the defendant was foreign, the First Circuit held that "the Lanham Act grants subject matter jurisdiction over extraterritorial conduct . . . only where the conduct has a substantial effect on United States commerce." Id. at 120. The First Circuit grounded its jurisdictional analysis in the twin purposes of the Lanham Act: "to protect the ability of *American* consumers to avoid confusion and to help assure a trademark's owner that it will reap the financial and reputational rewards associated with having a desirable name or product." Id. at 121 (emphasis in original).

Unlike the Second Circuit, which included comity concerns as a factor in its jurisdictional analysis, the First Circuit concluded that "comity considerations are properly analyzed not as questions of whether there is subject matter jurisdiction, but as prudential questions of whether that jurisdiction should be exercised" if the effects test is met. Id. In dicta (because it found that McBee had not presented sufficient evidence of "substantial effects"), the First Circuit noted that, had the plaintiff established jurisdiction, comity principles would have counselled for dismissal due to the clear conflict that the plaintiff's claims would have created with Japanese law. See id. at 126 n.15. It explained that the comity analysis must be particularly robust when a defendant's foreign exploitation of *its own* trademark rights is at issue because "it is quite a different thing for the holder of rights in a mark under [another country's] law to be ordered to refrain from uses of that mark protected by [that country's] law." Id. (quoting Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 746-47 (2d Cir. 1994)).

If the defendant is a United States citizen, the First Circuit endorsed the supervisory principle, stating that "a separate constitutional basis for jurisdiction exists for control of

15

activities, even foreign activities." Id. at 111. Because McBee involved a foreign defendant, the First Circuit passed on the question of what test would apply to a domestic defendant's foreign conduct, although it speculated that "the domestic effect of the international activities may be of lesser importance and a lesser showing of domestic effects may be all that is needed." McBee, 417 F.3d. at 118. At the very least, though, the First Circuit's analysis suggests that the critical jurisdictional inquiry is into harm to the interests of *American* consumers and trademark proprietors, and it underscores the importance of context in analyzing the extraterritorial reach of the Lanham Act.

Other courts considering this second interest—helping United States trademark owners protect their foreign markets under United States trademark principles—have found that the threshold for a "lesser showing of domestic effects" is low. For example, harm to the plaintiff's goodwill and reputation in the United States may suffice. See Steele, 344 U.S. at 286 ("competing goods could well reflect adversely on [plaintiff]'s trade reputation in markets cultivated by advertising here as well as abroad); Trader Joe's Co. v. Hallatt, 835 F.3d 960, 971 (9th Cir. 2016) ("There is nothing implausible about the concern that [plaintiff] will suffer a tarnished reputation and resultant monetary harm in the United States from contaminated goods sold in Canada"). Financial harm to a domestic trademark owner from loss of foreign sales may also be a sufficient effect, even if all the allegedly unlawful infringement activity occurred outside the United States. See, e.g., Am. Rice, Inc. v. Arkansas Rice Growers Co-op. Ass'n, 701 F.2d 408, 415 (5th Cir. 1983) ("Merely because the consummation of the unlawful activity occurred on foreign soil is of no assistance to the defendant"). Courts have also exercised extraterritorial jurisdiction where a defendant "'orchestrated [its] infringing activities' from the United States." Ocean Garden, Inc. v. Marktrade Co., 953 F.2d 500, 504 (9th Cir. 1991) (quoting

Reebok Int'l Ltd. v. Marnatech Enterprises, Inc., 737 F. Supp. 1515, 1520 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992)).

In each of these cases, though, the interest protected was a domestic company's federal trademark. In Steele, Bulova had federal trademark rights for watches, and the worry was that the defendant's sale of "spurious Bulovas" in Mexico might harm Bulova's reputational or financial interests related to its United States mark. 344 U.S. at 286. In Trader Joe's Co. v. Hallatt, a Canadian national purchased large quantities of products from a Trader Joe's supermarket in Washington, drove them across the border, and sold them at a mark-up in Canada, where Trader Joe's did not operate any stores. 835 F.3d at 963. The Ninth Circuit concluded that the Lanham Act reached this extraterritorial conduct because the defendant "engage[d] in commercial activity in the United States as part of his infringing scheme" and because his "attempt to pass as an authorized Trader Joe's retailer could . . . harm Trader Joe's' *domestic* reputation and diminish the value of its *American-held* marks." Id. at 971 (emphasis added). In another case, American Rice, Inc. v. Arkansas Rice Growers Co-op. Ass'n, both the plaintiff and the defendant were domestic farmers' marketing cooperatives that sold rice in the United States and abroad. 701 F.2d at 410. The plaintiff owned several federal trademarks, which it used to brand its rice in the Saudi Arabian market, where it did not own the marks. Id. at 410-11. The defendant used similar marks to sell its own rice in Saudi Arabia. Id. at 411-12. The Fifth Circuit, applying the supervisory principle, concluded that where (1) the defendant sold its products abroad under marks that infringed the plaintiff's domestic trademark rights and (2) the defendant had not established that it had priority rights to the mark under Saudi law, such that "it would be an affront to Saudi sovereignty or law" to prohibit it from using the mark there, extraterritorial enforcement of the Lanham Act was appropriate. Id. at 415-16.

Citing Steele, American Rice, and Trader Joe's, Hanes argues that it has sufficiently pleaded a domestic "effect" under the "lesser showing" required by McBee for domestic defendants where it alleges that: (1) Keds' foreign activities have had a detrimental effect on Hanes' goodwill and reputation, both abroad and domestically; (2) Keds' foreign activities have diverted sales from Hanes in foreign jurisdictions, resulting in a loss of revenue that affects Hanes in the United States; and (3) Keds designs and manufactures its allegedly infringing products in the United States, directs its international marketing from the United States, and funnels revenue derived from international activities through United States banking institutions. Pl's Opp. 3-7 [#35].

But this case is fundamentally different. Keds, not Hanes, owns the federal CHAMPION wordmark for shoes. Keds, not Hanes, has a protected federal interest in the mark. The second justification for the Lanham Act's extraterritorial enforcement—to help United States trademark owners protect their foreign markets—is not relevant to Hanes' claims here, because the only domestic rights that Hanes has in the mark as applied to shoes are those that it has acquired through the License Agreement. Nor does the first justification—"to protect the ability of *American* consumers to avoid confusion," 417 F.3d at 121—apply where there is no question that Keds may lawfully sell its CHAMPION-branded shoes in the United States. There is no risk of confusion here. Hanes has therefore failed to persuade the court that it has jurisdiction over its claims, which attempt to shoehorn Hanes' alleged *foreign* trademark rights into the Lanham Act. To the extent that Hanes is attempting to enforce its foreign trademark rights against Keds in foreign jurisdictions, the courts of those jurisdictions have the interest and expertise to adjudicate those disputes.

## IV.     Conclusion

For the forgoing reasons, Keds' Motion to Dismiss [#24] is GRANTED.

IT IS SO ORDERED.

May 21, 2021                                                    /s/ Indira Talwani
                                                                United States District Judge